ELIZA COLE v. NORTH DANVILLE COOPERATIVE CREAMERY ASSOCIATION.

May Term, 1930.

Present: POWERS, C. J., SLACK, MOULTON, and THOMPSON, JJ., and GRAHAM, Supr. J.

Opinion filed October 7, 1930.

*Shields & Conant* for the defendant.

36

*Searles & Graves* for the plaintiff,

38.

MOULTON, J. The plaintiff had driven a horse, attached to a Concord wagon, to the creamery operated by the defendant, for the purpose of delivering two cans of cream. While she was sitting in the wagon, at the unloading platform, waiting to have her cans returned to her filled with buttermilk, the safety valve of a boiler, used by the defendant to generate steam with which to cleanse the cans, suddenly blew off. The noise caused the plaintiff's horse to become frightened and unmanageable, with the result that the wagon was overturned and the plaintiff thrown out and injured. She sued in an action of tort, alleging negligence in permitting the steam to escape, in allowing the formation of an excessive steam pressure, and in failing to keep the boiler in a reasonably safe condition. The verdict was in her favor, and the defendant excepted.

An exception to the denial of the defendant's motion for a directed verdict presents a question of small difficulty. The safety valve was situated inside the building, with a top outlet within three inches of the ceiling of the boiler room. Directly over it was a flat sheet of metal, loosely nailed over a hole in the wooden ceiling. The evidence, taken in the light most favorable for the plaintiff, tended to show that some time before the accident fresh fuel had been put upon the fire, but no watch of the steam pressure had been kept; that the defendant's employees knew that the valve would discharge at ninety pounds

pressure; that they knew that the sound of the discharge of steam would frighten horses, because previously several other horses had been similarily frightened; that they knew, or ought to have known, that the plaintiff's horse was standing at the unloading platform near the boiler room, and about eight feet from the valve which was not visible from the outside; and that no effort was made to moderate the fire so as to avoid the escape of steam, and no warning was given of the situation. It also tended to show that the plaintiff's horse, as well as the other horses that had been frightened, was safe and gentle; that the noise of the escaping steam was augmented by the metal sheet nailed to the ceiling just over the valve, and the sound was such as would be likely to frighten an ordinarly gentle horse standing at the loading platform; that the standard practice was to pipe the steam out of doors so that the valve would discharge into the atmosphere, which would reduce the noise at least 50 percent.; and that it was entirely practicable, in this instance, to pipe the steam through the side of the building away from the unloading platform.

The plaintiff testified that at the time of the accident she knew that there was a steam boiler somewhere in the creamery, because she knew that steam was used to cleanse the milk cans, but that she did not know where the place of steaming was, or where the boiler was located. She had been in the building before that time, but only in that part where butter was churned and kept, and not in the boiler room. She had never noticed the smokestack.

Since the plaintiff entered the defendant's premises for a purpose connected with the defendant's business there carried on, and the parties had a mutual interest in the subject-matter of her visit she was, in law, an invitee. *Lucas* v. *Kelley*, 102 Vt. 173, 176, 147 Atl. 281, 283. It was the duty of the defendant, therefore, to use reasonable care to keep the premises in a safe and suitable condition, so that she would not be unnecessarily or unreasonably exposed to danger. *Selinas* v. *State Agricultural Soc.*, 60 Vt. 249, 254, 15 Atl. 117, 6 A. S. R. 114; *Bottum's Admr.* v. *Hawks*, 84 Vt. 370, 384, 79 Atl. 858, 35 L. R. A. (N. S.) 440, Ann. Cas. 1913A, 1025; *Sinn* v. *Farmers' Deposit Savings Bank*, 300 Pa. 85, 150 Atl. 163, 164. If a hidden danger existed, known to the defendant, but unknown to the plaintiff, it was the duty of the former to give due

warning of it. *Beard* v. *Conn. and Pass. R. R. Co.*, 48 Vt. 101, 106; *Sinn* v. *Farmers' Deposit Savings Bank, supra; Carlton* v. *Franconia Iron Co.*, 99 Mass. 216, 217; *Texas Co.* v. *Washington, B. & A. Electric R. Co.*, 147 Md. 167, 127 Atl. 752, 754, 40 A. L. R. 495; *Bradford* v. *Woolworth Co.*, 141 S. C. 453, 140 S. E. 105; *Calvert* v. *Springfield Electric Light & Power Co.,* 231 Ill. 290, 83 N. E. 184, 185, 14 L. R. A. (N. S.) 782, 12 Ann. Cas. 423; *Indermaur* v. *Dames,* L. R. 1, C. P. 274, 19 Eng. Rul. Cas. 64, 77, 78. And the plaintiff, as an invitee, had the right to assume that the premises, aside from obvious dangers, were reasonably safe for the purpose for which they were adapted. *Cruickshank* v. *Brockton Agricultural Soc.*, 260 Mass. 283, 157 N. E. 357; and that proper and safe appliances had been provided. *Fredericks* v. *Atlantic Refining Co.*, 282 Pa. 8, 127 Atl. 615, 617, 38 A. L. R. 666. On the evidence in this case the question of the defendant's negligence was clearly one for the jury. It is not claimed that the plaintiff was contributorily negligent.

So, also, whether the plaintiff assumed the risk was a jury question. Where, as here, no contractual relationship, such as that of master and servant existed between the parties, the doctrine of assumption of risk, which is based upon and limited by the maxim, *volenti non fit injuria,* is confined to cases where the plaintiff knew and appreciated the danger, and voluntarily, that is to say, of his or her own free will, put himself or herself in the way of it. Mere knowledge of the risk does not necessarily involve consent to it; the maxim does not apply on the mere showing of the knowledge of the danger, but only where the circumstances are such as to warrant the inference that the plaintiff encountered the risk freely and voluntarily with full knowledge of the nature and extent thereof. *Gover* v. *Central Vermont Ry. Co.*, 96 Vt. 208, 214, 215, 118 Atl. 874; *Zurich, etc., Acc. Ins. Co.* v. *Childs Co.*, 253 N. Y. 324, 171 N. E. 391, 392.

Certainly the evidence in the instant case afforded an insufficient basis for holding, as a matter of law, that the plaintiff knew and appreciated the danger that the steam would escape, and voluntarily chose to expose herself to it.

Fred Martin Byl was called as an expert witness by the plaintiff. In order to show his general experience with accoustics, sounds, and methods of reducing and controlling

sounds, he testified to his study of the subject and to his previous experience in reducing the noise made by different kinds of engines. He was then asked whether in his opinion there was any substantial difference between the problem of reducing the sound of steam escaping from a safety valve and that of reducing the sound made by the exhaust of a gasoline engine. This was offered upon the question of his qualifications and experience, and was received subject to defendant's exception on the grounds that it was immaterial, incompetent, and irrelevant. The answer was "no."

 Since the question itself called for an opinion, it had no tendency to show the qualifications of the witness, and it was error to allow it. But the evidence as to the competency of Mr. Byl was addressed to the court and not to the jury. *State* v. *Ward,* 39 Vt. 225, 236, 237; *Cairns* v. *Mooney,* 62 Vt. 172, 173, 19 Atl. 225. We cannot assume that an improper use was made of it. *Raithel* v. *Hall,* 99 Vt. 65, 74, 130 Atl. 749; *Lynch's Admr.* v. *Murray,* 86 Vt. 1, 13, 83 Atl. 746. There was other evidence tending to qualify the witness, and amply sufficient to support a finding that he was competent. We fail to perceive that prejudice has resulted from the ruling.

 The same witness and another, called and qualified as an expert by the plaintiff, were permitted, subject to defendant's exception, to testify that it was practicable to pipe the steam from the safety valve on defendant's boiler so that it would discharge out of doors. In this there was no error. Each witness had testified that it was a standard practice to pipe the steam to the outside of the building, either through the roof or through the side wall. The evidence tended also to show that by so doing the noise of the discharge would be reduced 50 percent., and that the efficiency of the plant would be in no way impaired thereby. Since it was claimed that the defendant was negligent in failing to follow a well-known and standard practice which would have eliminated or reduced the danger of such an accident as had occurred, evidence of the practicability of the change in piping was properly received. *Barney's Admx.* v. *Quaker Oats Co.,* 85 Vt. 372, 395, 82 Atl. 113; *Freed* v. *Standard Scale & Supply Co.,* 231 Pa. 616, 97 Atl. 72, 73; *Geno* v. *Fall Mountain Paper Co.,* 68 Vt. 568, 578, 35 Atl. 475. The fact that the witnesses did not say that this method was

the only standard practice did not operate to exclude it. *Barney's Admx.* v. *Quaker Oats Co., supra.*

Neither was it error to receive the testimony of several witnesses to the effect that the cost of making the change would be from twenty to thirty dollars. "Evidence that changes would require but a small expenditure is admissible to show that the change was reasonably demanded." *Spilene* v. *Salmon Falls Mfg. Co.,* 79 N. H. 326, 108 Atl. 808, 810; *Geno* v. *Fall Mountain Paper Co., supra; Tvedt* v. *Wheeler,* 70 Minn. 161, 72 N. W. 1062.

The witness, William High, was asked concerning the amount of noise he could hear while inside the boiler room of the E. and T. Fairbanks Company at St. Johnsbury when the safety valve discharged outside. Subject to the defendant's exception he answered in effect that the noise was slight. The defendant argues that this evidence was immaterial, because the issue was as to the sound apparent to one outside the boiler room, not to one inside, and that the situation was different from that existing at the defendant's creamery. However, if there was error, it is not shown to have been harmful. This exception is not sustained. *Parker* v. *Roberts,* 91 Vt. 219, 131 Atl. 21, 49 A. L. R. 1382; *Higgins* v. *Metzger,* 101 Vt. 285, 143 Atl. 394.

The testimony of the same witness that in his experience the blowing off of the safety valve could generally be prevented by watching the steam gauge was properly received. It was evidence tending to show a method of operating the boiler by which the escape of steam with its attendant danger might have been avoided. Whether the exercise of ordinary care required its adoption was a question for the jury.

Very soon after the accident X-ray photographs were taken of the plaintiff's shoulder which disclosed a fractured collar bone and shoulder blade on the right side, and the two physicians in attendance immobilized the forearm, arm, and shoulder by applying a dressing known as Sayre's dressing, by which the shoulder was brought backward and the arm placed diagonally across the chest with the hand resting near the opposite shoulder. During the trial several other X-ray photographs were taken, by which there appeared a healed Colles' fracture of the right radius, one of the bones of the forearm,

which had produced no deformity. All of the photographic plates were received in evidence.

Neither of the physicians knew, at the time of applying the dressing, that the radius had been fractured, although injuries other than the broken collar bone and shoulder blade were looked for. As far as was determined the radius was not out of position. It also appeared that unless the X-ray photographs were taken within six or eight months after the injury, it could not be told how long a time had elapsed since the break had occurred. The photographs which showed the fracture of the radius were taken approximately eighteen months after the accident.

Doctor Burke, one of the attending physicians, was asked:

"Why, doctor, did you not discover the break of the radius in the right arm at the examination which you made of Mrs. Cole at Doctor Sheffield's office on September 26, 1927?"

and subject to defendant's exception he answered:

"There wasn't any deformity and didn't get it."

The defendant insists that there was no evidence to support an assumption that the Colles' fracture was caused at the time of, and by, the accident in question; but an examination of the transcript leads us to a different conclusion. True, the X-ray photograph, by itself, did not show when it happened; and the plaintiff had been involved in two other similar accidents within the past two years, one before and one after the occurrence at the defendant's creamery. But the evidence tended to show that on neither of these occasions was there any injury to her right arm, while after the particular accident she lost the use of her right arm, at first entirely and later to a considerable extent, and at the time of the trial the use of her right hand was greatly impaired. Doctor Burke had already testified that, although her right arm was very carefully examined, and the fracture might have been discovered by manipulation, yet, since there was no displacement or deformity apparent and she complained of so much pain in her shoulder, no rigid methods of examination were employed. It also appeared that the Sayre's dressing was a proper method of treating a Colles' fracture.

With the evidence standing thus, we think that there was enough to warrant an inference that the fracture was caused

by the accident, and that although undiscovered it was healed by an appropriate treatment applied in ignorance of its existence. There was no error in receiving the testimony.

 The court charged the jury that, if the method in use at the defendant's creamery for permitting the steam to escape had been the best possible one, and still the danger was hidden and not obvious, notice or warning of such danger was necessary, if it should reasonably have been anticipated. To this the defendant excepted and now argues that this instruction made it an insurer of all hidden dangers, regardless of whether or not a prudent man should have appreciated them.

This criticism is unfounded. Elsewhere in the charge the jury was plainly told that the defendant was not an insurer, and owed only the duty of exercising reasonable care for the plaintiff's safety, but that this duty applied only to conditions which were in the nature of hidden dangers not known to the plaintiff and not to be observed or noticed by her in the exercise of due care. The assumption by the plaintiff of risk of injury from dangers which were obvious or should have been detected by her, in the exercise of the care and prudence of a prudent person was carefully explained. All this was to the apparent satisfaction of the defendant, for no complaint is made concerning it. The duty to give warning of a hidden danger would not be obviated by the adoption of the best possible method of disposing of the exhaust steam, because if the noise unavoidably produced by this method should constitute a hidden danger, the duty to warn would exist to the same extent as it would if an inferior device had been employed.

 The jury was also instructed that the defendant was not liable

"unless it should reasonably have anticipated that the escaping steam would frighten a horse of ordinary gentleness and safety in the location this horse was invited to stand. As to whether, acting as a prudent man would under similar circumstances, it should have anticipated such an outcome, you may take into consideration the prior accidents you find to have happened there by reason of horses of ordinary gentleness and safety becoming frightened by escaping steam, the nature of the noise and the proximity of the place where horses were permitted to stand when cream was being unloaded."

The ground for defendant's exception to this portion of the charge was that, if the noise were an incident to the legitimate operation of its business, it would not be liable, although a gentle horse should be frightened thereby.

But here again the purport of the charge is misunderstood. What the court was speaking about, as clearly appears from the context, was the element of anticipation of resulting injury as it entered into the definition of actionable negligence. The defendant was not held to be liable merely because the noise of the escaping steam frightened the plaintiff's horse. Elsewhere in the charge the jury was told that the defendant was not bound to operate its plant without noise and that:

"If you find that the escape of steam from the pop valve then at the creamery, and the noise it made, were merely incidental to the operation of the boiler as it was required to be operated by the defendant for the conduct of its business, and only such as a person of ordinary prudence might be bound to notice, then the defendant is not liable."

The language of the late Chief Justice Rowell in *Fassett* v. *Roxbury*, 55 Vt. 552, 555, 556, is apposite here:

"It is not profitable nor salutory to look into a charge with a carping disposition, but it should be taken as a whole; and although it may contain some expressions that, taken alone, would be error, yet if as a whole it breathes the true spirit and doctrine of the law, and there is no fair ground to say that the jury has been misled by it, it ought to stand."

Such is the case in this instance, and the exception is not sustained.

■ In the course of the charge the court read to the jury the various specifications of negligence alleged in the declaration. The defendant excepted on the ground that there was no evidence tending to sustain the allegation of negligence in allowing an excessive pressure of steam to accumulate. After the jury had deliberated over-night, without reaching a verdict, the court recalled it and expressly withdrew this allegation from its consideration, stating that there was no evidence from which it could be found that the steam pressure was excessive.

The defendant contends that the error in submitting the issue was not cured by its withdrawal after so long a time had elapsed. The plaintiff says that the charge as a whole did not submit the issue at all, and, indeed, an examination of the court's language therein leads one to this conclusion. But however this may be, and whether or not there really was evidence tending to support the allegation, we consider that the error, if any, was cured by the withdrawal. A very similar question was presented in *State* v. *Foss*, 100 Vt. 32, 134 Atl. 636, where a jury was recalled from its deliberations and an instruction previously given was corrected. Concerning this situation, we said (pages 35, 36 of 100 Vt., 134 Atl. 636, 638):

> "And, aside from this, prejudice to the respondent does not appear. The supplemental instruction was more favorable to him than was the original one. It was delivered at a time to emphasize its purport in the minds of the jury. We cannot assume that the jury did not, after retirement, give it careful consideration and due weight in reaching their verdict."

We have considered all the exceptions briefed, and find no reason for disturbing the result reached on trial below.

*Judgment affirmed.*