CHARLES C. WEBSTER *v.* CANADIAN PACIFIC RAILWAY COMPANY.

January Term, 1931.

Present: POWERS, C. J., SLACK, MOULTON, WILLCOX, and THOMPSON, JJ.

Opinion filed October 6, 1931.

462

*Walter H. Cleary* and *John W. Redmond* for the defendant.

*Shields & Conant* for the plaintiff.

SLACK, J.  The plaintiff was riding in an automobile owned and driven by one McNair when it was struck by one of the defendant's engines on a grade crossing in the village of East Barnet, and he received the injuries for which he is seeking to recover. He had a verdict and judgment below, and the case is here on defendant's exceptions.

The negligence charged is failure to give the statutory signals, failure to sound the bell which defendant had installed at the crossing, and excessive speed of the engine at the crossing.

At the close of all the evidence defendant moved for a directed verdict on the grounds, in effect, that the evidence failed to show any negligence on its part that was the proximate cause of the accident, that it failed to show freedom from contributory negligence on the part of the plaintiff, and that it showed that he assumed the risk of the danger that resulted in his injury.

The railroad track and the highway over which plaintiff was traveling cross at right angles. The former runs north and south; the latter east and west. The highway joins the main highway leading from St. Johnsbury to Wells River 466 feet west of the crossing. The railroad runs in nearly a straight course for more than 3,700 feet north from the crossing, and, but for the obstructions presently to be noticed, could be seen this distance in the daytime from all points on the highway between the St. Johnsbury-Wells River road and the crossing. There are five buildings on the northerly side of the highway leading to the crossing the frontage of which on the highway and their relative location is substantially as follows: 180 feet east of the St. Johnsbury-Wells River road is a house with a barn connected, the combined frontage being 60 feet; 37 feet east of these is what has been referred to as the Army and Navy store with a frontage of 16 feet; 44 feet east of this is a storehouse with a frontage of 30 feet; 21 feet east of this is a restaurant with a frontage of 30 feet; and fifteen feet east of this is the railroad station which is 24 feet wide  The east side of the station is 12 feet from the west rail of the defendant's track and the south end of it is 10 feet from the traveled part of the highway. Because of the angle at which they face the highway, and their length, some of these buildings, especially the Army and Navy store and storehouse, obstruct the view of the track to the north more than their width indicates.  There was evidence of other obstructions of this view, namely, lumber piles, an automobile, and an auto truck.  Another building referred to by some of the witnesses is Roy's office, which is located on the south side of the highway, approximately 240 feet west of the crossing.  The accident happened between 6.40 and 7.00 o'clock in the morning of December 13, 1929.  The evidence tended to show that in that locality it was then frosty, foggy or hazy, so that the view of the engine was dim or indistinct, although the headlight was burning, and that it was run at a high rate of speed.

The question of defendant's negligence in failing to sound the crossing bell was withdrawn from the jury because there was no evidence to show that it knew or ought to have known that the bell was not working properly. But since it was held that whether or not that bell was sounded was a circumstance bearing on the question of plaintiff's contributory negligence, the evidence tending to show that it was not sounded will be noticed in connection with the evidence tending to show that the other signals were not given.

■ There is no merit in the first ground of the motion. The rule that a motion of this nature will not be entertained where there is substantial evidence to support the plaintiff's claim is too well established to require a citation of authorities. Such is the situation here. The question of speed as an element of negligence aside for the present, the situation at this crossing was such that it was negligent for the defendant to run its engine over it without giving the statutory signals. There was substantial evidence that it neither gave these nor sounded the crossing bell.

The plaintiff testified that he and McNair were in a Ford coupe, McNair on the left and the plaintiff on the right; that the left window was open and the right window partly open; that he was familiar with the crossing—had been over it many times; that he had heard the whistle and crossing bell on previous occasions; that he was "listening for sounds of the engine" as he approached the crossing, and that he did not hear the whistle, the engine bell, or the crossing bell.

It appeared that four other persons, MacMillan, Hadley, Coty, and Benton, were in a Whippet sedan a short distance back of the McNair car, and traveling in the same direction. Hadley was driving and sat in the left front seat; Coty sat in the right front seat; MacMillan sat in the left rear seat, and Benton sat in the right rear seat. The left front window of the car was broken out, the rest were closed. MacMillan testified that after they left the St. Johnsbury-Wells River road he "was looking and listening toward the track"; that they had got as far as the Roy office when the accident occurred; that he did not hear the whistle, the engine bell, or the crossing bell; that he had heard those signals on other occasions when between the corner and the track. To be sure he admitted on cross-examination that he wouldn't swear that the crossing bell was not ring-

ing, but he insisted that he did not hear it, and testified: "I think if it were there I should have heard it, I would have heard it." Coty testified that after they left the St. Johnsbury-Wells River road he was looking and listening to see and hear what he could; that he did not hear the whistle or either bell; that he had heard those signals on other occasions when in the same relative position. On cross-examination he admitted that he did not have the signals in mind, and that "probably" they might have been given and he not hear them, and that he had previously signed a statement to the same effect. Hadley testified that he was looking and listening; that he didn't hear the whistle or either bell; that he had been going over that route for two months and had heard all those signals on other occasions when between the corner and the crossing. He admitted on cross-examination that it was "possible" that they were given and he did not hear them, but to the question "And you didn't pay any attention as to whether or not the bell was ringing, did you?" he answered "I think I did." Benton testified that he did not hear the whistle or either bell, but was not asked by either party whether he was listening.

A Mr. Turner testified that he ran the restaurant already referred to, which it was admitted was a place where the signals could be heard; that he "never heard anything until that (the engine) struck"; that he was not paying attention to the signals; that they might have been given, but if they were he didn't realize it, or recall it.

Mrs. Turner testified that she was in the restaurant on the side next the track, and heard the crash; that she realized a train was coming but didn't notice the whistle or recall hearing the engine bell; that she was not paying attention to either, and that they might have been sounded. One Donahue testified that he was in the restaurant about to eat breakfast when the accident happened; that his hearing was good, and that he didn't hear the whistle or either bell. While he admitted on cross-examination that he was not paying attention to or listening for the signals, he testified that his attention was called to whether they were given as soon as he heard the crash and went to the door, and that he had talked that matter over with a lot of people, the first probably five minutes after the accident.

■■ While this evidence is not all of the same probative value, for the reasons pointed out in *Lefebvre's Admr.* v. *Central*

*Vermont Ry. Co.,* 99 Vt. 366, 133 Atl. 359, it is affirmative in character, and was clearly sufficient to take the case to the jury on the question of defendant's negligence in failing to give the various signals.

True, the defendant produced more witnesses who testified that the signals were given than the plaintiff called to show that they were not. But this is not determinative of the question. Cases are frequently decided on the quality of the evidence rather than the quantity. The defendant calls attention to *Wellman* v. *Wales,* 98 Vt. 437, 129 Atl. 317, and *Harrington* v. *Rutland Railroad Co.,* 89 Vt. 112, 94 Atl. 431, where it is said, in effect, that testimony that is contradicted by undisputable *physical facts* has no probative value, and argues that it is an undisputable *physical fact* that the engine bell was ringing because ten witnesses testified that they heard it. Of course this is not so. *Shields et al.* v. *Vermont Mut. Fire Ins. Co.,* 102 Vt. 224, 237, 147 Atl. 352, 358, where it is said that "testimony which is not impossible, thought it may be unreasonable, inconsistent, or contradictory, is for the jury's consideration," is more in point.

See, too, *Robey* v. *Boston & Maine Railroad,* 91 Vt. 386, 100 Atl. 925, and cases cited. The defendant insists that its witnesses were entitled to greater credit than were the plaintiff's witnesses. Apparently the jury thought otherwise, and it is for the jury and not the court to pass upon the credibility of witnesses, except in rare instances. This is not one of them.

The second ground of the motion is likewise untenable. We are not concerned with the negligence of McNair, if any, since it is not claimed, nor could it well be, that his negligence was imputable to the plaintiff. *Leclair* v. *Boudreau,* 101 Vt. 270, 143 Atl. 401; *Higgins Admr.* v. *Metzger,* 101 Vt. 285, 143 Atl. 394; *Lefebvre's Admr.* v. *Central Vt. Ry. Co.,* 97 Vt. 342, 123 Atl. 211. The rule deducible from these cases is that while the standard of duty is the same as to both driver and guest, that is, each must exercise the care of a prudent person, in like circumstances, the conduct required to fulfill that duty is ordinarily different, because the circumstances are different. It is said in *Leclair* v. *Boudreau, supra,* quoting from *Clarke* v. *Connecticut Co.,* 83 Conn. 219, 76 Atl. 523: "What conduct on the passenger's part is necessary to comply with this duty must

depend upon all the circumstances, one of which is that he is merely a passenger having no control over the management of the vehicle in which he is being transported.'' Another important circumstance to be considered is the care or lack of care of the driver. Manifestly, a guest riding with an apparently careful, attentive driver would not be required to exercise the vigilance that he would if riding with a heedless, reckless driver. So far as appears, except for this accident, McNair was a competent driver.

The plaintiff's evidence tended to show that the car in which he was riding slowed down as it left the St. Johnsbury-Wells River road and proceeded toward the crossing at 12 to 15 miles per hour; that it slowed down after it passed Roy's office so that the stop light showed; that 16 feet from the crossing it was going about 10 miles an hour, and was practically stopped when the accident occurred. The plaintiff testified that McNair ''had his car under perfect control, what I considered perfect control''; that before they left the St. Johnsbury-Wells River road both he and McNair looked up the track, and also ''when we got aways further''; that ''we looked to the left all the way down''; that he first saw the engine when about 16 feet from the track, when it was 100 feet from the crossing; that McNair saw it about the same time, and immediately applied his emergency brakes. He also testified that he was familiar with that crossing; that he had heard the whistle and crossing bell when approaching the crossing on previous occasions; that he was ''listening for sounds of the engine,'' and did not hear the whistle, the engine bell, or the crossing bell.

McNair was not called as a witness—the plaintiff testified that he could not locate him—and there was no direct evidence that he had been over this crossing before, but the speed at which he approached it, and his apparent lookout for a train, as testified to by the plaintiff, justified the inference that he knew the crossing was there and was acting in the light of such knowledge.

The defendant insists that, if the plaintiff looked and listened, as he testified that he did, he could not have failed to discover the approaching engine. This is not necessarily so. The jury must have found that the statutory signals were not given, or at least that the engine bell was not rung, which probably accounts for the plaintiff's failure to hear that. The loca-

tion of the buildings on the north side of the highway was such, to say nothing of the other obstructions, or weather conditions, that after a person going toward the crossing got within 286 feet of it he might look up the track several times, and at different places, and not see a "wild" or "spare" engine, such as this one was, approaching the crossing, depending upon whether when he looked through one of the open spaces the engine was within range of his vision or behind one of the several buildings, and this was the condition to within 16 feet of the crossing.

Another important circumstance to be considered in this connection is the condition of the crossing bell, whether or not it was ringing as McNair and the plaintiff approached the track. The defendant had maintained this bell for at least two years prior to the accident, voluntarily or otherwise, which makes no difference. *Dolph* v. *New York, etc., R. R. Co.*, 74 Conn. 538, 51 Atl. 525; *Martin* v. *Baltimore & P. R. R. Co.*, 2 Marv. (Del.) 123, 42 Atl. 442. The plaintiff knew that it was there and had heard it ring on previous occasions. He had a right to assume, until his senses advised him to the contrary, that he would not encounter danger at the crossing when the bell was not ringing.

While one about to enter a grade crossing is not relieved from exercising due care by the fact that a known signal, of whatever character, does not indicate that a train is approaching, he is not required to exercise the same vigilance that would be required of him if the signal was given. The fact that the signal is not given should be taken into consideration in determining whether such person exercised due care in the circumstances. *Stegner* v. *Chicago, etc., R. R. Co.*, 94 Minn. 166, 102 N. W. 205; *Chicago, etc., R. R. Co.* v. *Blaul*, 175 Ill. 183, 51 N. E. 895; *Sights* v. *Louisville, etc., R. R. Co.*, 117 Ky. 436, 78 S. W. 172; *Cleveland, etc., R. R. Co.* v. *Heine*, 28 Ind. App. 163, 62 N. E. 455; *Dolph* v. *New York, etc., R. R. Co.*, *supra; Martin* v. *Baltimore, etc., R. R. Co.*, *supra.* The question at issue in those cases was the negligence of the driver, and not that of a guest; but obviously a guest cannot stand less favorably. To be sure the plaintiff was familiar with this crossing, and he looked and listened; but he had no control over the car, he observed that McNair was apparently on the lookout, that he was running the car at moderate rate of speed, and had it, as the plaintiff thought, under perfect control. In the cir-

cumstances, the question of plaintiff's contributory negligence was for the jury.

It is urged that the plaintiff looked and listened so attentively that he does not come within the rule applicable to ordinary guests, because by looking and listening and failing to discover the engine the proximate cause of the accident was his negligence in whole or in part. *Erie R. R. Co.* v. *Hurlburt* (C. C. A.), 221 Fed. 907; *Rebillard* v. *Minneapolis Ry. Co.* (C. C. A.), 216 Fed. 503, 507 L. R. A. 1915B, 953; and *Cotton* v. *Willmar & Sioux Falls Ry. Co.*, 99 Minn. 366, 109 N. W. 835, 836, 8 L. R. A. (N. S.) 643, 116 A. S. R. 422, 9 Ann. Cas. 935, are relied upon to support this claim. These cases are distinguishable from the one before us, and do not modify the well-established rule, respecting the rights and duties of a guest. In the first of them the duty of keeping a lookout for the train was apparently left entirely to the plaintiff who was riding with her husband in a closed carriage. The highway crossed the railroad at an angle of about 31 degrees. The plaintiff and her husband were traveling nearly due west. The train that struck them was running in a southwesterly direction, on their right. From the crossing and for some distance on the highway over which plaintiff was traveling, the train was plainly visible for about 1,500 feet. About 15 feet from the crossing the team was stopped and both the plaintiff and her husband looked and listened for the train which they knew was due. Neither saw or heard it. After that the husband did nothing to discover the train, but the plaintiff continued to look through an opening she had made in the curtains. She testified that she didn't tell her husband ''to drive on and I will keep watch through there, but he knew that I was looking at the back, the same as he had looked too, before.'' For obvious reasons, where the duty and responsibility of keeping a lookout for danger is shifted from the driver to the guest with the acquiescence of both, as it apparently was in that case ever after the stop was made, the rule applicable in ordinary circumstances would not avail the guest. Such was not the situation in the instant case.

In *Rebillard* v. *Minneapolis, etc., Co.*, the plaintiff and two other persons besides the driver were riding in an automobile, at the latter's invitation, over what appeared to be a very indistinct prairie trail, about twelve o'clock at night, without lights other than a very dim kerosene lamp on the dash of the

car. None of the persons were familiar with the trail. Near where the accident happened they got off the trail, and in attempting to get back went into an excavation made by the defendant. The undisputed evidence showed that if they had had proper lights they would not have taken the trail, and, consequently, the accident would not have happened. In speaking of this situation the court said: ''The plaintiff, as a reasonably prudent person, must have known of the danger incident to riding in a motor car on a dark night, without lights, over roads with which neither the driver of the car, nor any of the persons with him in the car, were familiar. When with full knowledge of that fact the plaintiff remained in the car he was as guilty of negligence as the driver himself.'' The conclusion there reached was undoubtedly justified by the circumstances.

In *Cotton* v. *Willmar, etc., Co.,* the plaintiff was riding in a livery team driven by a man in the employ of its owner. The top of the carriage was up. The street over which they were traveling ran east and west. The railroad track ran north and south. The depot stood west of the track and just south of the crossing. When between 50 and 70 rods west of the crossing, both the plaintiff and the driver heard the whistle of a locomotive. They proceeded at a brisk pace until within 7 rods of the crossing, when the team was brought to a walk, and both looked and listened for the train. The driver who sat in the side of the carriage next the depot apparently did not discover the train, although at the time the engine must have been behind the depot, and the train extended beyond, to the south, where it would have been visible in the day time. The plaintiff looked to the north and saw a light which he took to be the headlight of a locomotive, and said, ''There is the headlight.'' Apparently assuming that they had ample time to cross the track before the train would come that distance, both parties settled back in the seat, and the driver drove rapidly upon the track, where they were struck by the train coming from the south. It was held that the facts were sufficient to sustain the finding that the plaintiff was not guilty of contributory negligence, and in reaching that conclusion the court applied the rule which it is said above is deducible from *Leclair* v. *Boudreau, etc., supra.*

The law relating to the doctrine of assumption of risk has been so recently stated in *Grover* v. *Central Vt. Ry. Co.,* 96 Vt. 208, 118 Atl. 874, and *Cole* v. *North Danville Co-*

*operative Creamery Assn.*, 103 Vt. 32, 151 Atl. 568, that it need not be stated here. It is enough to say regarding the last ground of the motion that what has been said respecting the evidence in considering the question of contributory negligence suffices to show that it cannot be held as matter of law that plaintiff assumed the risk of the danger that occasioned his injury.

The motion for a verdict was properly overruled.

■■ One Jenks, a witness called by the plaintiff, testified that he was a photographer with fifteen years' experience; that he took the pictures which are Plaintiff's Exhibits 1 to 10, inclusive; that the civil engineer located the camera position for each of them; that number 4 was taken from a point in the highway 17 feet west of the westerly rail of the track; that each of the succeeding numbers to and including 10 was taken from a point in the highway 50 feet farther west than the point from which the preceding number was taken; that he was attempting to get from those points all that the camera would show of the track, and that he thought the pictures fairly represented the conditions when they were taken. On cross-examination he testified that there were places toward the west where one could get a good view of the track after leaving the St. Johnsbury-Wells River road, but that he was trying to take pictures that would give the best view of the track from the position where his camera was located. He was then asked: "If you were given a job as a photographer to take pictures which would explain to the jury the view that they could see as you travel from the cement road eastward toward the crossing, what further view that they would get of the track, just what view you would get, you wouldn't place your camera in any such place as you put them at this time, would you?" This was excluded subject to defendant's exception. The witness further testified in cross-examination that the engineer located the camera positions under the direction of plaintiff's counsel. It is urged that this evidence tended to test the veracity and accuracy of the witness, to discredit him and the pictures, to show his lack of ability as a photographer, and to show his interest and prejudice and that of those who directed his work. We fail to see how it tended to show any of these things, unless it was the interest and prejudice of those who directed the witness's work, and the evi-

dence as it stood gave the defendant the full benefit of that. What the witness would have done had he been free to act on his own judgment was of no consequence since it appeared that he had no choice in selecting the places from which the pictures were taken, but simply acted under orders which were fully and freely disclosed.   Moreover, the scope of cross-examination rests largely in the discretion of the trial court, and its ruling thereon is not revisable in the absence of an abuse thereof.  *Merrihew's Admr.* v. *Goodspeed,* 102 Vt. 206, 147 Atl. 346, 66 A. L. R. 1109; *Saliba* v. *N. Y. C. R. R. Co.,* 101 Vt. 427, 144 Atl. 194. Abuse does not here appear and the exception is without merit.

██ ██   The witness MacMillan, after testifying that he did not hear the whistle or either bell the morning of the accident, was asked whether on previous occasions when approaching the track he had been able to hear signals given, and, subject to the objection that it was "wholly immaterial what he heard or didn't hear on any occasion," answered, "I have heard signals given there."   Immediately following, in answer to a question by the court, he testified that he was between the corner and the crossing when he heard such signals.   It is now argued that the question objected to did not specify what signals the examiner referred to, and that it did not appear that the conditions were the same on the other occasions as they were at the time in question.   The objection was too general to save these questions.   As against any legitimate claim now urged against it, the evidence was properly received.   Besides, it was harmless in any event, since like evidence from other witnesses of equal reliability so far as appears was subsequently admitted without objection.  *People's National Bank* v. *Brunelle,* 101 Vt. 42, 140 Atl. 160, and cases cited.

██ ██   The defendant took these exceptions to the charge:   "(10). We except to the failure of the Court to instruct the jury that if the bell on the engine was rung, and the crossing bell, the automatic signal at the crossing was ringing, that the jury cannot find any negligence of the defendant because of any speed of the engine that is shown by the evidence. (11). We except to the failure of the Court to instruct the jury that if the engine bell was ringing and the two long and two short blasts of the whistle were given as defendant's evidence tends

to show they were, and the crossing bell was ringing, that no negligence can be found by the jury on the part of the defendant because of any speed of the engine shown by any evidence in this case.''

They are both relied upon, but since they are the same in substance, except the whistle signal is not covered by the first, they are considered together. As we have seen, the question of whether the crossing bell was sounded was withdrawn from the consideration of the jury as an element of negligence on the part of the defendant. The defendant strenuously insists that by its charge the court likewise eliminated from the consideration of the jury the question of the excessive speed of its engine. It closes a somewhat exhaustive discussion of this phase of the case in its brief in this language: ''So that, the speed and the failure of the crossing bell to ring having been taken from the jury, there was left of the defendant's alleged negligence only its alleged neglect to give the statutory signals.'' It then adds, ''If this Court should disagree with us in the foregoing contention, and should hold that excessive speed of the locomotive, as it approached and traversed the crossing, was submitted as a distinct ground on which the jury might find defendant negligent and liable, then we submit''; that the jury was not justified in finding excessive speed, etc.

If, as the defendant contends, the question of the speed of its engine at the crossing was not submitted to the jury as a distinct ground of its negligence and liability, and we adopt its view respecting this, the jury must necessarily have found that it failed to give one or both of the statutory signals, since there was no other basis for their verdict. This being so, the failure of the court to charge in the particular complained of, if error, was obviously harmless. In all of the cases cited by the defendant in support of its contention that the charge was faulty in the respect indicated, the speed of the train was the ground of negligence, or one ground, submitted to the jury. No case has come to our attention, and probably none can be found, that holds that such a charge as the defendant insists should have been given in the instant case is necessary, or proper, where, as here, the only negligence in issue was failure to give statutory signals. Since the exception under consideration is predicated upon the assumption that such signals were given, and the ver-

dict necessarily finds that they were not the exception is value-less.

This disposes of all questions raised by the exceptions.

*Judgment affirmed.*

NOTE. WILLCOX, J., sat in the hearing of this case, but took no part in the disposition of it.