MARY LABRIS (MARY LABRIS SELIGMAN)

*v.*

WESTERN NATIONAL INSURANCE COMPANY, *et al.*

(No. 10179)

Submitted January 17, 1950. Decided February 28, 1950.

LOVINS, PRESIDENT, dissenting in part and concurring in part.

*John E. Jenkins,* for plaintiff in error.

*Marcum & Gibson, Tom Baker,* for defendant in error.

Riley, Judge:

Mary LaBris (Seligman) instituted in the Circuit Court of Cabell County her action in assumpsit against Western National Insurance Company and Federal Insurance Company to recover damages under windstorm indorsements attached to fire insurance policies issued by the defendant companies to the plaintiff on her two-story brick building situated in the City of Huntington. The defendants prosecute this writ of error to a judgment of the circuit court in the amount of $1,540.26 based upon a jury verdict.

The declaration alleges that plaintiff is the owner of a two-story brick business building situated at No. 747 Third Avenue in the City of Huntington; that the defendant insurance companies each issued to plaintiff a policy of fire insurance in the amount of five thousand dollars, covering the peril of fire and lightning, with a windstorm indorsement attached to each; that plaintiff sustained damages in the amount of $1,540.26, "caused by windstorm" on June 8, 1947; and that the damages sought represent the cost of repairing the center portion of plaintiff's building, which, plaintiff alleges, had collapsed as the result of a windstorm occurring on that day.

Both policies of insurance describe plaintiff's building as a "Two-Story brick building with approved roof, occupied for automobile and tire repair shop on first floor, storage on second floor * * *." The extended coverage indorsements upon which this action was based provide "* * * the coverage of this policy is extended to include direct loss by Windstorm, Hail, * * *." Both policies contain the provision that "Provisions Applicable Only to Windstorm and Hail: This Company shall not be liable for loss caused directly or indirectly by (a) frost or cold weather or (b) snowstorm, tidal wave, high water or overflow, whether driven by wind or not."

On June 8, 1947, about three o'clock in the afternoon, the center portion of the roof of plaintiff's building next to the eastern wall thereof collapsed, causing damage representing the cost of repairs in the amount of $1,540.26.

Defendants interposed by way of defense on the extended coverage indorsements on the policies that the roof was caused to collapse by a stoppage of the drainpipe thereon, which was located about the center of the roof in a lengthwise direction, and next to the eastern wall thereof, which resulted in such an accumulation of rain water on the roof that the weight thereof caused the roof to collapse. This defense raises the only factual issue in this case, and the primary question on this writ of error is whether there is sufficient evidence for jury determination that the damages resulted from windstorm as distinguished from water accumulating on the roof.

The evidence conflicts on the question whether at the time there was a high windstorm in the vicinity of plaintiff's building, but that conflict of evidence does not of itself make this case one for jury determination, for the specific question before us is whether there is sufficient evidence in this record for the jury to find that a windstorm was the direct cause of the damages sought to be recovered.

Various witnesses testified that at the time in question there was a high windstorm in the vicinity of the plaintiff's building. Meredith B. Flesher testified that on July 10, 1946, while engaged in the roofing and sheet metal business with his father, he put a new roof on plaintiff's building; that at that time he examined the structural part of the building to see if it would carry a new roof and found "It was in excellent shape"; that in placing the new roof his organization removed about 28,000 pounds of old roofing, replacing it with 1,100 pounds of roofing. The witness testified that on the day the roof was damaged there was a "terrible windstorm"; that he had numerous calls "all over town, porches or roofs blowing off, and repairing"; and that in his opinion the high wind about which he testified would "definitely" have contributed to the damage to the roof, together with the weight of the water. On cross examination this witness testified that the stud wall around the roof had not buckled on the east side of the building where the roof collapsed.

Two witnesses for plaintiff, Anna Brown and Virginia Chinn, who lived in the building next to the damaged property, testified that on the afternoon of June 8, at the time plaintiff's property was damaged, there was a high wind, the former testifying that "I thought my windows was coming in."; that it tore some of the ceiling off in the hall; and that she looked through the window of the garage and saw "stuff all over the cars." The latter testified that the wind on that occasion was blowing so hard she was afraid to take her child to fill an engagement at a doctor's office.

There is testimony by B. K. Chatwell, a witness for plaintiff, who took photographs showing the roof after the collapse. He testified that a limb had blown from a tree on his porch at Westmoreland, a distance of several miles from plaintiff's building.

The official government weather report at Huntington for June 8, 1947, introduced in evidence by the defendant, shows that between midnight on June 7 and 8 and the time the roof collapsed 2.83 inches of rain fell; and that the maximum wind velocity between 6:46 a. m. and 5:45 p. m. on June 8 was six to seven miles an hour. This report shows that between 12:28 a. m. and 3:38 o'clock p. m. of the afternoon on which the roof collapsed five thunderstorms occurred, and that the wind during the last thunderstorm, which began at 3:38 p. m., about the time the roof collapsed, was six miles an hour.

H. N. Robinson, a deputy sheriff of Cabell County, who is employed by the Department of Commerce to keep records of rain fall with the use of a rain gauge testified that for the twenty-four hours between 6:00 p. m. on June 7 and 6:00 p. m., on June 8, there was a recorded rain fall of 4.2 inches.

Only one witness, a witness for the defendants, John Miller, who was formerly an employee of the roofing company which replaced plaintiff's roof, was an eyewitness to the actual collapse of the roof. He and his wife were occupying a room on the third floor of the Grand

Hotel, which overlooked the roof of plaintiff's building near the center of the building. This witness testified that he saw the roof collapse about four o'clock in the afternoon of June 8, 1947; that during the morning and afternoon of June 8, at the time the roof collapsed, it was more than half covered with water; that he heard a noise like someone was throwing something against the wall between the hotel and plaintiff's building; and that when he opened the window and looked out "that wall made a lot of noise and it buckled out and buckled away from this side [the east side] and collapsed in." He further testified that at that time the weather was "pretty nice" and there was no wind blowing; and that the water on the roof immediately before the collapse was about eighteen inches deep and covered seventy-five feet of the one hundred and fifty-foot length of the roof.

The printed record contains photographs of the roof taken in its collapsed position. These photographs were exhibited to the jury, and show the roof collapsed near the center in a lengthwise direction, and next to the eastern wall of plaintiff's building.

. Partially corroborating Miller's testimony, defendants' witness, James W. Glover, testified that while walking along Third Avenue in front of plaintiff's building shortly after the roof collapsed, he noticed large volumes of water flowing from the first floor of the building and across the sidewalk in front thereof; that on looking into the garage he heard and saw water falling on trucks and cars from the floor above; and that it was not raining or storming at that time. Evidently, this water came through the hole in plaintiff's roof and dripped to the ground floor. C. R. Neighborgall, a building contractor, who repaired the roof after it collapsed, testified that the drain was located about the center of the roof and a foot or two away from the eastern brick wall; and that from the north and south the roof sloped to a drain, which was the only way that water could run off the roof, unless it went over the sides of the walls. This witness further testified that the roof

was so constructed that it would not hold any considerable amount of water.

This record contains uncontradicted evidence to the effect that the drain on the roof was clogged at the time of the collapse, and that shortly before and at the time of the collapse there were thirty-eight to forty-five tons of water on the roof.

Without stating in further detail the evidence portrayed by this record, we are impressed with the fact that there is no competent testimony in this case to show that the collapse of the roof was the result of a windstorm. In our opinion, the evidence predominates in favor of the theory that the collapse occurred by reason of the accumulated water and not because of a windstorm. With the exception of Miller's testimony, this record contains the testimony of no witness who actually saw the collapse of the roof. True, several witnesses, including M. B. Flesher, who put a new roof on this building in July, 1946, testified that there was a high wind on June 8, 1947, and gave the opinion that this wind "definitely" would have contributed to the damage of the roof. Of the same quality and character as Flesher's testimony is that of defendants' witness, E. R. Rinard, an insurance adjuster, who investigated plaintiff's claim, to the effect that from his twenty-odd years' of experience as an adjuster, an examination of the collapsed roof disclosed no evidence that the damage had been caused by windstorm; and the testimony of plaintiff's witness, Anna Brown, on direct examination, that, "Well, I just noticed it [the ground floor of plaintiff's building] caved in on—You know, water must have caved it in, or something caved it in on them cars, Mr. Craft's cars."

The opinion testimony of these three witnesses, none of whom had qualified as an expert, is entitled to little weight. "The opinions of witnesses not experts are entitled to little or no regard, unless they are supported by good reasons founded on facts which warrant them; but if the reasons and facts, upon which they are founded, are

frivolous, the opinions of such witnesses are worth little or nothing." *Kerr* v. *Lunsford,* 31 W. Va. 659, pt. 14 syl., 8 S. E. 493. To like effect see *Boone* v. *Equitable Holding Co.,* 32 F. Supp. 896, reversing *Beckley National Bank* v. *Boone,* 115 F. 2d 513, certiorari denied, *Boone* v. *Equitable Holding Co.,* 313 U. S. 558, 61 S. Ct. 835, 85 L. ed. 1519. In view of the physical facts disclosed by the photographs in evidence showing (1) that the roof was caved in next to the eastern wall of plaintiff's building, near the center of the roof, and at the place where the evidence discloses the drain was located; and (2) that the air funnels, appearing in the photographs, remained undisturbed after the collapse, except the one in the vicinity of the collapsed part of the roof, which was caused to bend in an easterly direction toward the hole in the roof by the sag thereof leading toward the hole next to the eastern wall, and the uncontradicted evidence of defendants' witness Miller, the only eyewitness to the collapse, the opinion testimony of the witnesses Flesher, Rinard and Brown, based as it is on no controlling concrete facts, and not sustained by good reasons, our conclusion is that the evidence in this case does not by a preponderance of proof sustain plaintiff's theory of the case; nor does it sustain the burden on plaintiff to prove that a windstorm proximately or directly caused the damage to plaintiff's property. At best the opinion testimony of these non-expert witnesses is highly conjectural, involves the ultimate issue in the case, and tends to invade the province of the jury. Had it been objected to, it would have been inadmissible. See 20 Am. Jur., Evidence, Section 782; *Barna* v. *Gleason Coal & Coke Co.,* 83 W. Va. 216, 98 S. E. 158; *Cavender* v. *Cline Ice Cream Co.,* 101 W. Va. 3, 131 S. E. 862; *Hancock* v. *Snider,* 101 W. Va. 535, 133 S. E. 131; *Lively* v. *Virginian Railway Co.,* 104 W. Va. 335, 140 S. E. 51; and *Collar* v. *McMullin,* 107 W. Va. 440, 148 S. E. 496.

In the case of *Walker* v. *Strosnider,* 67 W. Va. 39, 67 S. E. 1087, a non-expert witness, who was not an eyewitness, was held competent to testify as to the physical facts which caused the fall of a building. In that case, this

witness was in the building a few minutes before it fell, observed indications of the impending collapse, and was on the premises and examined the building immediately after it fell. In point 17 of the syllabus thereof this Court held that the witness' opinion evidence "* * * is admissible in evidence, on the ground that the impression, made upon his [the witness'] mind at the time, is in the nature of a physical fact, and, the further ground of his obvious inability to portray to the jury all of the facts, tending to produce the impression." The experience of plaintiff's witness Flesher as a roofer did not qualify him to give an opinion that the collapse occurred by reason of a windstorm; and, by the same token, the experience of defendants' witness Rinard as an adjuster did not qualify him to give an opinion to the effect that the damage to the roof was not caused by a windstorm. In fact, the latter's testimony that his examination of the collapsed roof did not indicate to him any evidence that the damage, in fact, had been caused by windstorm, is indeed of little or no value. The opinion testimony of these witnesses and that of plaintiff's witness, Anna Brown, as heretofore indicated, is purely conjectural and speculative. In the recent case of *State, for the Use of Stout* v. *Rogers,* 132 W. Va. 548, pt. 4 syl., 52 S. E. 2d 678, this Court held: "The verdict of a jury in favor of a plaintiff, based on testimony which does nothing more than furnish grounds for conjecture or speculation as to the proper verdict to be returned, cannot be justified, and will be set aside by this Court."

The plaintiff having failed to establish the burden of proof that she was within the protective provisions of the windstorm coverage clauses of her policies, it is our opinion that the verdict in her favor should be set aside.

Inasmuch as this case may be retried, we deem it advisable that attention be directed to the other two grounds of error: that the trial court erred (1) in giving plaintiff's instruction No. 2 over defendants' objection; and (2) in overruling defendants' motion for a mistrial, based on the remarks of plaintiff's counsel made during the closing argument.

Plaintiff's instruction No. 2 reads as follows:

"The Court instructs the jury that if they believe and find from all of the evidence in this case that the building of the plaintiff was damaged by collapse of part of its roof and that such damage would not have occurred except for the effect of the windstorm as described in said evidence, then the defendants as insurers under the policies of insurance upon which this action is based are liable and responsible for such damage, even though there may have been another cause which may have contributed to the collapse of said roof."

This instruction is objectionable because, as heretofore indicated, the evidence is insufficient to permit a jury to find that the collapse of the roof was proximately caused by a windstorm. We think in addition that the instruction is confusing and inaptly drawn. While it is true that the accumulation of water on plaintiff's roof does not come within the exception contained in the riders to the two policies, exempting the insurer from liability for loss caused "directly or indirectly by * * * (b) * * * high water or overflow, whether driven by wind or not," nevertheless we think that, in order for plaintiff to recover in this case, wind must be an efficient cause of the loss, and the qualifying word "direct" in referring to the cause of the loss means "proximate or immediate." 5 Appleman, Insurance Law and Practice, Section 3142; *Trexler Lumber Co. v. Allemannia Fire Insurance Co. of Pittsburgh,* 289 Pa. 13, 136 A. 856; *Insurance Company of North America v. Leader,* 121 Ga. 260, 48 S. E. 972-974. In *Coyle v. Palatine Insurance Co.* (Tex. Com. App.) 222 S. W. 973, the Court held that a policy covering direct loss by wind provided indemnity "only against direct loss or damage by the wind. This means, and can only mean, a loss resulting from the wind and no other cause, and fairly capable of establishment as having been so caused." We think that, in order for plaintiff to recover under the instant policies, it must be established that a windstorm of itself was sufficient to, and did cause the damage to plaintiff's roof, though there may be other contributing causes. In this

regard we do not adopt the holding of the Circuit Court of Appeals of the Sixth Circuit in *Pearl Assurance Co., Limited* v. *Stacey Bros. Gas Construction Co.,* 114 F. 2d 702, in which the Court held that under a policy insuring against all "direct loss and damage by windstorm" but excluding from coverage loss caused by water or rain, whether driven by wind or not, the insured could recover, where accumulated rain water was a contributing cause of the damage and a windstorm was also a contributing cause.

We perceive no error in the trial court's overruling defendants' motion for a mistrial. This motion was based on a remark of one of plaintiff's counsel during the closing and final argument to the jury: "You are a valued policy holder until you have a claim, and then you are trying to beat the company." A similar statement had been made previously by the other of plaintiff's counsel in his closing argument, and objected to. The trial court overruled defendants' motion for a mistrial, and instructed the jury to disregard the statement of counsel. This case is unlike *State* v. *Graham,* 119 W. Va. 85, 191 S. E. 884; and *State* v. *Gill,* 101 W. Va. 242, 132 S. E. 490, in which a defendant was charged with a crime "so revolting that it is difficult for the average jury to give to the one accused the benefit of a reasonable doubt." The remark of counsel upon which the motion for a mistrial was based, was highly improper, and served to prejudice the jury. In view, however, of the nature of the instant case and the trial court's prompt action in sustaining defendants' objection to the remark and instructing the jury to disregard it, we think that any prejudice which any members of the jury may have entertained because of the prejudicial remark of counsel was obliterated from their minds by the ruling and action of the trial court thereon.

We reverse the judgment of the Circuit Court of Cabell County, set aside the verdict of the jury, and grant the defendants a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*

LOVINS, PRESIDENT, dissenting in part and concurring in part:

I concur in the reversal of the judgment in this case, upon the ground that it was error to give plaintiff's instruction No. 2 over the objection of the defendants; but I respectfully dissent from the reasoning that the evidence is insufficient to sustain the verdict. I think point 1 of the syllabus states a correct abstract principle of law, but, in my opinion, it is fallacious to apply that principle to the evidence in the instant case, and, in so doing, I think the Court is, in effect, passing on the weight of the evidence and the credibility of the witnesses.

It is the function of a court to consider and evaluate all the evidence to determine whether it is legally sufficient to sustain the verdict, but, in so doing, the evidence should not be so dissected and divided as to give each item thereof piecemeal consideration. I think the evidence in this case, considered as a whole, is such as establishes more than a ground for speculation and conjecture. Plaintiff's witnesses testified that there was a windstorm of considerable force at the time plaintiff's roof collapsed, and it is a reasonable inference, which the jury was authorized to draw, that the windstorm caused it to collapse. It will not do to say that such inference is wholly disproved by the evidence for the defendants, or by the so-called physical facts.

A comprehensive definition of a physical fact is as follows: "A fact considered to have its seat in some inanimate being, or, if in an animate being, by virtue, not of the qualities by which it is constituted animate, but of those which it has in common with the class of inanimate beings." Black's Law Dictionary, Third Ed., page 1359; 3 Bouvier's Law Dictionary, Rawle's Third Revision, page 2586. The foregoing definition is derived from 1 Benth. Jud. Ev., page 45. See also Burrill On Circumstantial Evidence, page 130. Probably a more practical definition will be found in 1 The Modern Law of Evidence, Chamberlayne, page 67, wherein the author states: "Classifying facts in general, according to whether they are within or

without the body of the observer, they may be divided into (1) physical, of which the knowledge of the observer comes through the *perception* of the senses; and (2) psychological, comprising feelings, emotions and other phases of the mind of which the latter is intuitively aware."

There have been some loose expressions which seem to confuse the phrase "physical fact" with "real evidence." Real evidence is an object "addressed to the sense of the tribunal, as where objects are presented for the inspection of the jury." Jones on Evidence, Civil Cases, 3d ed., page 8. The "physical fact" rule is applied very sparingly by the courts. See *Myers* v. *Transit Co.*, 128 W. Va. 564, 570, 37 S. E. 2d 281, 283; *Webster* v. *Canadian Pac. Ry. Co.* (Vt.), 156 A. 524; *Schmitt* v. *St. Louis Transit Co.* (Mo. App.), 90 S. W. 421.

The "physical facts" alluded to by this Court rested in its observations made from a photograph of the damaged building. But when it is considered that the movement of objects to which the force of wind has been applied, a photograph thereof does not disclose with any certainty the condition of such object. Furthermore, it is well known that the location, course of movement and condition of objects moved by wind, or other force, natural or artificial, cannot be determined definitely by natural laws. We should refrain from applying the "physical fact rule" unless the facts are established beyond peradventure, and the person testifying as to the existence of such facts observed them within a short time after the fact under inquiry or at issue occurred.

I think the oral testimony of the witnesses in this case presented an issue of fact for determination by the jury, and, therefore, that this Court, in holding that the evidence was insufficient, rests its conclusion upon an unsound basis.

However, I think that it was error to give plaintiff's instruction No. 2, and for that reason I would reverse the judgment of the trial court.