**BECKLEY NAT. BANK et al. v. BOONE et al. (MOSELEY, Intervenor).**

**No. 4676.**

Circuit Court of Appeals, Fourth Circuit.

Nov. 13, 1940.

514

John Q. Hutchinson, of Beckley, W. Va., and Frank N. Bacon, of Fayetteville, W. Va. (Mahan, Bacon & White, of Fayetteville, W. Va., on the brief), for appellants.

Connor Hall, of Huntington, W. Va. (Samuel Biern, of Huntington, W. Va., Leo Loeb, of Charleston, W. Va., and William L. Lee and C. R. Summerfield, both of Fayetteville, W. Va., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal revolves around the central contention that on and after January 1, 1929, John A. Boone, late of Beckley, West Virginia, deceased, was insane, and unable to understand the results of an ordinary business transaction. Based on the assumption that he was insane as early as 1924, equity proceedings were brought by his widow and children in the District Court on November 14, 1935 to set aside numerous judgments filed against him while incompetent, and also to set aside certain transfers of real and personal property made in execution of the judgments under the authority of the West Virginia courts. The District Court found insanity as of January 1, 1929 and issued a decree whereby the judgments were annulled and the transfers were set aside, although Boone was represented by competent counsel in the prior litigation in the state court, and no effort was made by the plaintiffs to show to the District Court that the debts upon which the judgments were based were not justly due and owing other than their contention that Boone was incompetent at the time they were incurred.

Boone died on May 30, 1935 at the age of eighty-one years. He left a will whereby he devised and bequeathed all of his property to his wife and his two sons in equal shares. Prior to 1920 he had been engaged as a coal operator, producing and shipping coal from mines in West Virginia,

in which he was a large stockholder. He had been engaged in this business for more than thirty years, and as he was a man of good business ability and sound judgment, he had amassed a considerable fortune. In 1920 he retired from the active management of the mines and moved his residence to the town of Beckley in an adjoining county. He established in this town the business of a steam laundry. His other interests, in which he was engaged with four brothers, included six corporations engaged in business relating to the mining of coal in West Virginia. He was also interested in a cold storage building in Beckley.

During the years prior to 1929 Boone borrowed for his personal use, and he and his brothers borrowed for the corporations in which they were interested, large sums of money evidenced by notes made and renewed again and again, which, in 1929, they found themselves unable to pay. Consequently more than fifty judgments in addition to tax liens, aggregating $296,337.68, were filed against him and certain of his brothers. On April 19, 1929 a general creditors' suit was instituted against him in the Circuit Court of Raleigh County, West Virginia, and he retained lawyers of unquestioned standing and ability to represent him. They endeavored, with some success to delay the progress of the suit in order to enable him and his brothers to liquidate their properties to advantage and pay their debts. Private sales, however, were not feasible, and the final result was that on November 15, 1930 a decree was entered whereby special commissioners were appointed by the court to sell various parcels of his real estate in Raleigh and Fayette Counties, and the sales were made and the lands were conveyed to the purchasers. Grantees of some of these purchasers filed intervening petitions in the proceedings in the District Court asking that no decree be entered which would prejudice their title to the properties.

The District Court in the pending case appointed a special master to make findings of fact and conclusions of law in regard to the controversy. The findings and conclusions reached by the special master were confirmed in all respects by the District Court on April 4, 1940, Boone v. Equitable Holding Co. et al., 32 F.Supp. 896, by a final decree wherein the following adjudications in substance were made:

(1) Boone was mentally competent prior to January 1, 1929, and mentally incompetent at all times thereafter; (2) all notes made or endorsed by him, upon which the judgments against him were rendered by the state courts, were made or endorsed while he was sane; (3) all the judgments against him, except two, were set aside and the judgment creditors were enjoined from collecting the judgments from his estate; (4) all orders and decrees in the general creditors' suit in the state court and the deeds of the special commissioner therein to purchasers at the judicial sales thereunder were cancelled and set aside without prejudice, however, to the title of certain persons to whom the purchasers at these sales had conveyed portions of the land; (5) the executor of Boone's will was given judgment against certain purchasers at the judicial sales for rents and royalties collected by them after they acquired the property; (6) the right was reserved to the sons of Boone (the widow having died in the meantime) to assert their claim to rents and royalties collected from the real property of Boone subsequent to his death; and to apply for an allowance of counsel fees to be paid by the defendants; (7) the executor and distributees of Boone's estate were enjoined from pleading limitations to claims based on his notes.

The broad scope of this decree and its widespread effect in disturbing rights acquired in good faith under the proceedings of the state court are manifest, and the clear duty is imposed upon this court to examine with care the findings of fact of the District Court and the conclusions set forth in its decree.

██ In making this investigation, we must adhere to the rule that an appellate court will not disturb the findings of a special master, confirmed by a district judge, upon a disputed question of fact, unless a very plain mistake has been made. Warren v. Keep, 155 U.S. 265, 15 S.Ct. 83, 39 L.Ed. 144; Earle v. Myers, 207 U.S. 244, 28 S.Ct. 86, 52 L.Ed. 191; Cory Mann George Corp. v. Old, 4 Cir., 23 F.2d 803; General Finance Corp. v. Keystone Credit Corp., 4 Cir., 50 F.2d 872, certiorari denied, Adams v. Keystone Credit Corp., 284 U.S. 684, 52 S.Ct. 201, 76 L.Ed. 578; Stewart v. Wall, 4 Cir., 87 F.2d 598, certiorari denied, 302 U.S. 684, 58 S.Ct. 26, 82 L.Ed. 528. But as this court has said previously, the findings of a special master, as ap-

proved by the judge below, though entitled to weight, are persuasive only and not controlling. The review in this court is a real review and not a perfunctory approval. Crawford v. Neal, 144 U.S. 585, 12 S.Ct. 759, 36 L.Ed. 552; Furrer v. Ferris, 145 U.S. 132, 12 S.Ct. 821, 36 L.Ed. 649; National Manufacture & Store Corp. v. Whitman, 4 Cir., 93 F.2d 829; see also, Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, and Standard Acc. Ins. Co. v. Simpson, 4 Cir., 64 F.2d 583. See, also, 52 (a) of the Federal Rules, of Civil Procedure, 28 U.S.C.A. following section 723c.

The testimony offered to support the charge of insanity was given by members of Boone's household and by employees, business men, political associates and friends. The testimony of members of his family and of servants in his house related to strange and peculiar actions, such as going to bed with his clothes on, putting salt in his corn flakes, carelessness in dress, making statements or complaints about alleged happenings in the household that did not take place, searching for members of his family when they were in his presence, inability to understand the presence in the home of persons who were there as employees, speaking of events in the distant past as if they were happening in the present, and a general inability to use his reasoning faculties.

Certain business men testified about queer actions of Boone and stated that he paid extravagant sums for Beckley real estate and was incompetent to do business before 1929. Cross-examination weakened much of this testimony.

Employees and friends testified that he wanted to do things in an unreasonable way; that he ran his business in a loose fashion, and that he was absent minded and would stand with his mouth open and drool; that he forgot his promises and obligations; that his memory was generally poor; that he was garrulous and lived in the past, and that he was absent minded and easily influenced; that he was confused or forgetful as to the details of his business and of the property that he acquired, and that he took little interest in his business but left it to be carried on by others, and was in fact incapable of doing it himself, and that he failed to recognize his friends when meeting them on the street.

Political associates said that Boone attended the meetings of the City Council, of which he was a member, in 1926 and 1927, and voted on the measures proposed, but never said anything or proposed anything himself; that he wandered aimlessly about the streets and denied the ownership of property that belonged to him.

There is no conflict in the testimony on one point. It is conceded that on March 14, 1933, Boone was suffering from senile dementia, an incurable disease. The dispute relates to the point of time when this undoubtedly able and successful man became unable to attend to business. No mention has been made of the established fact that Boone began to drink heavily in 1925, and that in 1928 and 1929, to which much of the testimony of the plaintiffs relates, he was frequently under the influence of intoxicating liquor. As he grew older he became more susceptible to the effects, and it may be that some of the queer actions attributed to him were caused by this fact.

Attorneys who handled the complicated affairs of the Boone companies were in frequent contact with him before and after January 1, 1929. They testified that he acted in an intelligent manner, discussed with them the general creditors' suit instituted in April of 1929, and other law suits instituted in his behalf in the same year, gave them necessary information, and showed himself familiar with the facts connected with the litigation and with the affairs of his various companies. In 1929 he made business trips with them and executed a contract prepared by them. It never occurred to them to make the point in the general creditors' suit that he was insane. Indeed he was used as a witness in a tax case in 1931 and again in a tort case as late as February 12, 1932. His wife was joined as a plaintiff in the pending case. The attorneys consulted with her at the time of the creditors' suit in 1929 and later when other litigation was on foot, but she did not suggest that Boone was insane or incompetent to attend to his affairs.

Much testimony was offered on the defendants' behalf by business men who had contact with Boone and an opportunity to observe his conduct during the critical period. From 1921 to 1931 he personally made bank deposits in the Beckley banks and wrote checks; in 1931 he exhibited the laundry plant and explained the laundry business to a prospective purchaser of stock in the laundry company and sold him 501 shares of stock. In 1929 and 1930 Boone explained to an engineer in an intelligent manner the difficulties he was having with

water in the laundry plant and seemed capable of transacting ordinary business matters. In 1928 or 1929 he and his brothers organized the American Export Corporation to pool the Boone holdings and sell them, or borrow money on them to pay the debts. It was soon after the organization of this corporation that the creditors' suit was instituted. In 1926 and 1927 Boone was a member of the City Council of Beckley and was recognized as a useful member of the body. He was nominated for the term that covered 1928 and 1929, but he and his running mates were defeated.

It has already been shown that after Boone came to Beckley, he established the Raleigh Steam Laundry Company. He operated the plant as general manager from 1923 to 1931, assisted by a superintendent and other employees. He came early in the morning and spent several hours daily at the plant. During this period, he superintended the buying of supplies, looked after collections and disbursements, and made up pay rolls. His associates were of the opinion that he was competent to transact business in 1929 and later.

In 1926 Boone persuaded a resident of Beckley to invest $30,000 in a cold storage plant. It was built and leased to a provision company. Boone collected the rent, paid the taxes and accounted to his associate for his share of the income from 1926 to the end of 1929.

Both sides presented the testimony of expert medical witnesses. Three doctors testifying for the plaintiffs in answer to a hypothetical question which summarized the plaintiffs' lay testimony stated that Boone was incompetent in their opinion to transact business after 1923. One of them, however, qualified his testimony when confronted with the testimony which showed Boone's activities in connection with the cold storage plant and said that if this testimony was true, Boone was competent during the period covered thereby. Another doctor said that if the abnormal actions disclosed by the testimony were due to the use of alcohol, then his opinion would not be worth anything; and that if Boone was able to handle complicated business transactions after 1923, then the previous expert testimony was all wrong. The other doctor was not cross-examined. As we have seen, the court refused to find that Boone was incompetent from and after 1923.

Seven doctors testified on behalf of the defendants that Boone did not become incompetent before the year 1931 or thereafter. Several of these witnesses had personal acquaintance of long standing with Boone. Two of them assisted in conducting the lunacy examination in 1933 when Boone was found to be incompetent; and they had transacted business with him during the prior years. They noticed no signs of mental weakness before 1930 or 1931. Three other physicians treated him as a patient or had business relations with him and were of the opinion that he was sane throughout 1930 and 1931 and prior thereto. Two other physicians, in answer to hypothetical questions, gave the opinion that Boone's abnormal actions resulted from drink and that he was mentally competent prior to 1931.

Under the law of West Virginia as elsewhere, the presumption is in favor of sanity. Carrigan v. Davis, 84 W.Va. 473, 100 S.E. 91; Eakin v. Hawkins, 52 W.Va. 124, 43 S.E. 211. Old age, weakening of the memory and understanding, and occasional strange and eccentric acts are not of themselves sufficient evidence of incapacity. The test is the ability to know the nature, character and effect of one's acts, and to understand the subject matter of business transactions in which one is engaged. Buckey v. Buckey, 38 W.Va. 168, 18 S.E. 383; Beade v. Feay, 63 W.Va. 166, 167, 61 S.E. 348; Woodville v. Woodville, 63 W.Va. 286, 60 S.E. 140; Burkle v. Abraham, 112 W.Va. 257, 164 S.E. 150. Bearing these rules of law in mind, and the testimony on both sides which we have summarized, our conclusion is that the failure of the plaintiffs to show that Boone was mentally incompetent in 1929 is plainly made out.

But if this conclusion is wrong and Boone was in point of fact insane on January 1, 1929, the decree of the District Court must nevertheless be set aside. The court held not only that Boone was insane on that date, but also that all of the notes on which the judgments and the sales of his property were based were executed while he was sane. The plaintiffs endeavored in the District Court to show that Boone's insanity antedated the execution of most if not all of the notes; but the District Court found to the contrary, and the plaintiffs have accepted this finding and have made no effort in this court to show that the notes did not

represent just obligations. The rule of law is well established that a judgment rendered against an insane person not represented by a guardian or committee is not on that account void; and it will not be set aside even upon direct attack on the ground of insanity alone. To set it aside there must also be shown a meritorious defense to the claim. Stigers v. Brent, 50 Md. 214, 33 Am.Rep. 317; Maloney v. Dewey, 127 Ill. 395, 19 N.E. 848, 11 Am.St.Rep. 131; King v. Robinson, 33 Me. 114, 54 Am.Dec. 614; Feldott v. Featherstone, 290 Ill. 485, 125 N.E. 361; Watson v. Horner, 178 Iowa 499, 159 N.W. 1032; Lutter v. Neubauer, 100 N.J.L. 17, 125 A. 113. The rule is applied even in states where it is provided by statute that in suits against an insane person, a guardian ad litem for the defendant must be appointed. The requirement is procedural and does not affect the jurisdiction of the court. Home Life Ins. Co. v. Cohen, 278 Mich. 169, 270 N.W. 256; Bobell v. Wagenaar, 106 Or. 232, 210 P. 711; see also, 34 A.L.R. 221.

The law of West Virginia supports the same view. In Withrow v. Smithson, 37 W.Va. 757, 17 S.E. 316, 19 L.R.A. 762, the court considered a suit in equity to enforce against the land of the defendant the lien of a judgment. The defense was that the defendant was insane when the trial took place and the judgment was rendered, and the answer prayed that the judgment be annulled because of the insanity. The court said:

37 W.Va. at page 758, 17 S.E. at page 316, 19 L.R.A. 762, "A judgment against one insane at the time it is rendered is not void, and cannot be collaterally attacked, and, not being void, is a lien on land. * * *"

37 W.Va. at page 759, 17 S.E. at page 317, 19 L.R.A. 762, "In section 152 of 1 Freem. Judgm., it is stated as law that, 'while an occasional difference of opinion manifests itself as to the propriety or possibility of binding femes covert and infants by judicial proceedings in which they were not represented by some competent authority, no such difference has been made apparent in relation to a more unfortunate and defenseless class of persons, but, by a concurrence of judicial authority, lunatics are held to be within the jurisdiction of the courts. Judgments against them, it is said, are neither void nor voidable. They cannot be reversed for error on account of defendant's lunacy; the proper remedy in favor of a lunatic being to apply to chancery to restrain proceedings, and compel the plaintiff to go there for justice.' The current of authorities sustain this statement of the law."

37 W.Va. at page 760, 17 S.E. at page 317, 19 L.R.A. 762,

"It seems very plain that a judgment against one so insane as to be incapable of making defense, and armed with good defense, should not stand irrevocable, and gross injustice be thus enforced. It is one of the birth springs of equity jurisdiction that it renders justice where the law is harsh, and its remedy blank or inadequate. The case of an unjust judgment against a lunatic would seem to be a fit place for its intervention. * * *

"Equity having jurisdiction, ought the court, in this case, upon the evidence, to have overthrown the judgment? We think not, as in our opinion the evidence fails to sustain the allegation of insanity. We are the more satisfied in reaching this conclusion as we find that a full, and, so far as we see, adequate, defense, was made to the action in which the judgment was rendered."

The statute law of West Virginia has provided for many years before and after this decision that if an infant or insane person is party defendant to a suit, the court shall appoint a guardian ad litem to represent his interest. Laws of West Virginia 1882, Chapter 71, § 13; Code of 1923, Chapter 125, § 13; Code of 1937, § 5565. But this requirement is not jurisdictional. It was so held in Chapman v. Branch, 72 W.Va. 54, 78 S.E. 235, where the widow and children of a decedent brought a suit in equity to set aside certain decrees in a prior suit wherein lands had been sold to pay the decedent's debts. Two of the children, who were infants at the time of the prior suit, although named as defendants therein, were not described by their correct names, and hence it was contended that these infants were not made parties to the suit. It transpired that a guardian ad litem was appointed and answered for all of the infant defendants by the names designated in the bill, and the true names of the infants appeared in the testimony. The court overruled the contention, saying (72 W.Va. at page 60, 78 S.E. at page 238): "We find that in most jurisdictions, in practically all, except where controlled by

statute, the omission to appoint a guardian ad litem, or irregularities therein, are not regarded as jurisdictional, but amount to reversible error only, not going to the jurisdiction of the court. 22 Cyc. 641; 15 Am. & Eng.Ency.Law, 9, and case cited in notes. We have examined most of these cases and find them supporting the text." See, also, Eakin v. Hawkins, 52 W.Va. 124, 43 S.E. 211.

The authority of this case is not weakened by what is said in Ferrell v. Ferrell, 103 W.Va. 704, 138 S.E. 399, for in that case the lack of jurisdiction over infant defendants was placed on the ground that they had not been summoned and no answer had been filed on their behalf by the guardian ad litem. Chapman v. Branch has been cited in later cases to support the statement that a purchaser at a judicial sale, confirmed by the court, is protected from any errors which are not jurisdictional. Blankenship v. Mongini, 105 W.Va. 530, 552, 143 S.E. 301; Merchants' Nat. Bank v. Ralphsnyder, 113 W.Va. 480, 487, 169 S.E. 89.

We conclude that the decree of the District Court must be reversed, not only on the ground that the evidence fails to support the holding of insanity prior to the institution of the general creditors' bill against Boone, but also because it affirmatively appears that the court had jurisdiction over Boone in that suit and there is nothing to show that the obligations upon which the judgments against him were based were not justly due and owing.

The decree of the District Court will be reversed and the case remanded with directions to dismiss the bill of complaint.

Reversed and remanded.