800 F.2d 377
 George Albert HUDNALL; George Albert Hudnall and Carol
Hudnall, his wife; James Robert Panagoulis, Appellees,
v.
John Eugene SELLNER, Appellant.
George Albert HUDNALL; George Albert Hudnall and Carol
Hudnall, his wife; James Robert Panagoulis, Appellees,
v.
John Eugene SELLNER, Appellant.
 Nos. 81-2109, 82-1565.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 6, 1986.
Decided Sept. 8, 1986.
 
 Roger M. Witten (Bruce M. Berman, Michael Dreeben, James Sottile, Wilmer, Cutler & Pickering, Washington, D.C. on brief), for appellant.
 George F. Pappas (H. Russell Smouse, Baltimore, Md. on brief), for appellees George Albert Hudnall and Carol Hudnall.
 Thomas J. Scanlon, Washington, D.C. on brief, for appellee James Robert Panagoulis.
 Before HALL, PHILLIPS, and MURNAGHAN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 John Sellner appeals from a judgment entered on a jury verdict awarding substantial compensatory and punitive damages against him and in favor of plaintiffs George Hudnall, Carol Hudnall, and James Panagoulis in these consolidated diversity actions for defamation, loss of consortium, and malicious prosecution. Sellner, by court-appointed counsel, argues that the judgment should be set aside or a new trial granted on a number of grounds, principally, his mental incompetence at the time of the conduct for which he was found liable, his mental incompetence at the time of trial, the excessiveness of the punitive damages award, and the award of compensatory damages for loss of consortium where no physical injury to either spouse was involved.
 
 
 2
 We affirm in all respects.
 
 
 3
 * These proceedings, as tragic to all concerned as they are bizarre, trace in origin to the brutal murder in 1968 of Martha Ann Hudnall, then the wife of George Hudnall, one of the plaintiffs in this action. The resulting official investigation was unsuccessful. No suspects were ever arrested. The crime remains unsolved today.
 
 
 4
 In January 1977, John Sellner, defendant in this action, entered the picture. Until his involuntary termination in 1974, Sellner had been a member of the Prince Georges County, Maryland, police department. At the critical period of Sellner's tenure and termination, George J. Panagoulis, was chief of that department. James R. Panagoulis, another of the plaintiffs, is chief George J. Panagoulis' son.
 
 
 5
 In May of 1977 Sellner began to make various allegations about George Hudnall and James Panagoulis that led eventually to this lawsuit. His original and central charge was that James Panagoulis had murdered Martha Ann Hudnall, a fact he claimed only recently to have learned from a member of the Prince Georges County police department. At this time, Sellner launched a private investigation which he pursued with relentless zeal and dreadful consequences for the next three years in an asserted effort to verify and round out his central charge. As a result of his investigation, Sellner claimed to have discovered that shortly after the murder, James Panagoulis was transported to Florida by members of the Prince Georges police department as part of a deliberate cover-up to which Panagoulis' father, the chief of police, was a party. As the culminating feature of this cover-up, so Sellner claimed to have learned, Hudnall and James Panagoulis at some point switched identities. According to Sellner, this meant that "Panagoulis," now living in Florida, was in fact Hudnall; and that "Hudnall," now living in West Virginia with his new wife, plaintiff Carol Hudnall, was in fact Panagoulis.[1]
 
 
 6
 Sellner broadcast this convoluted version of events, charging at its core murder, bigamy, and misprision of felony, widely, in great volume, and by various means. He made the charges orally to numbers of people. He circulated composite photographs and "wanted posters" depicting "Panagoulis/Hudnall" as a murderer. He elaborated various details of the charges in memoranda, letters, postcards, birthday cards, and various other mailings. He went to both the Florida and West Virginia localities where Panagoulis and the Hudnalls respectively lived to spread his accusations. He made the charges in letters and other mailings to the Acting Governor of Maryland, the Chairman of the Maryland Workman's Compensation Commission, various law enforcement officers and other government officials in West Virginia and Florida, and, most cruelly, to friends and members of the Panagoulis and Hudnall families. In 1979, he swore out a felony warrant in Montgomery County, Maryland, charging Panagoulis with bigamy. The charge was nol prossed.
 
 
 7
 Panagoulis and the Hudnalls suffered the obvious distress that the wide publication of these charges were calculated to cause for around a year and a half before taking legal action. Finally, in August of 1978, George and Carol Hudnall commenced a diversity action against Sellner, claiming on George Hudnall's behalf compensatory and punitive damages for defamation, and on their joint behalf, compensatory damages for loss of consortium. Shortly thereafter, Panagoulis commenced a diversity action claiming in three counts compensatory and punitive damages for defamation and, in one, compensatory and punitive damages for malicious prosecution.[2] The two actions were consolidated in pre-trial proceedings. During the course of the pre-trial proceedings, Sellner's privately retained counsel sought and was granted leave to withdraw as counsel on the stated basis of his inability to represent Sellner satisfactorily to either client or counsel. Sellner then voluntarily undertook his own representation throughout the remaining proceedings in district court.
 
 
 8
 The case was tried to a jury for ten days. Sellner, acting pro se, made opening and closing arguments, examined and cross-examined witnesses, introduced documentary exhibits, and participated in various proceedings incident to trial motions. The district judge permitted Sellner wide latitude in offering testimonial and documentary evidence and in the scope of his cross-examination of plaintiffs' witnesses, while holding him within ultimate technical bounds.
 
 
 9
 The plaintiffs' evidence of Sellner's conduct and of its impact upon them was detailed, wholly plausible, and devastating. Sellner's defense challenged neither the plaintiffs' evidence of what he had done nor the impact upon them of what he had done; it consisted solely of efforts to establish the truth of his charges. These efforts were palpably ineffectual.
 
 
 10
 The plaintiffs' account of the impact upon them of Sellner's undisputed conduct therefore stood unrefuted by any denial or conflicting testimony. That evidence need not be recounted in detail, but for purposes of this appeal, some of its more salient elements should be summarized.
 
 
 11
 Before Sellner's onslaught began, Hudnall and his wife Carol were living contentedly in Monroe, West Virginia, where Hudnall was employed as a mechanic by the state highway department. Hudnall was well-respected and liked by neighbors and colleagues. Sellner's unrelenting accusations effectively blighted Hudnall's reputation and "turned his life around." He felt embarrassment and humiliation in the community where he lived and worked; and was pained by the distress caused his parents when they received Sellner's postcards and "wanted posters" accusing their son of murder and related crimes. His fellow employees, made suspicious by Sellner's charges, disassociated themselves from him. He became a loner. Unable to concentrate on his work, he requested reassignment to a more sheltered work setting.
 
 
 12
 His relations with his wife and daughters deteriorated due to his anxiety and distress. He began to withdraw from his family to avoid questions by his daughters about the "wanted posters." He became increasingly irritable in his marital relationship, which theretofore had been a good one. He was made to relive in memory the brutal circumstances of his first wife's murder. In consequence, he began to drink heavily, which added further to the deterioration of his marital and family relationships. For his wife, the year 1977 was "hell and anguish" as a result of Hudnall's emotional condition. Their marital relationship deteriorated to the point that she considered, and sought counsel as to whether she should seek, divorce.
 
 
 13
 Panagoulis experienced comparable consequences of Sellner's written and oral accusations. His friends became suspicious of him as a result of the charges and began to shun him. As a result of information communicated by Sellner that Panagoulis was "wanted" on criminal charges in Maryland, local Florida police subjected Panagoulis to public humiliations by stopping him on a public street and taking him to a police station for questioning. As a result of the depression and anxiety caused by Sellner's charges and harassment, Panagoulis sought psychiatric care and was driven finally to shooting and seriously wounding himself in a suicide attempt.
 
 
 14
 On this evidence, the jury found Sellner liable on all the claims brought by the Hudnalls and Panagoulis. It awarded George Hudnall $250,000 compensatory and $300,000 punitive damages on his individual defamation claim; George and Carol Hudnall $100,000 compensatory damages on their joint claim for loss of consortium; and James Panagoulis a total of $170,000 compensatory and $350,000 punitive damages on his defamation claims and $25,000 compensatory and $50,000 punitive damages on his malicious prosecution claim.
 
 
 15
 Following the denial of his post-verdict motion to set aside the verdict and for new trial, Sellner took this appeal. Because of this court's concern that the issues be adequately developed on this appeal from such substantial monetary judgments, we appointed counsel, with Sellner's consent, to represent him on this appeal.
 
 II
 
 16
 Two sets of issues are raised by Sellner through his appointed counsel. The first include straightforward challenges to the legal support for the verdicts; it is claimed that (1) the evidence of actual malice was insufficient to support an award of punitive damages on the Hudnall and Panagoulis defamation claims; (2) the award of punitive damages was, in any event, excessive; and (3) the claim for loss of consortium was not a legally cognizable one because there was no physical injury.
 
 
 17
 The second set of issues attacks the judgment more generally, on the basis of Sellner's asserted mental incompetence. It is contended that (1) as a substantive matter, his manifest mental incompetence at the time of the conduct for which he was found liable should have been ruled to constitute an absolute defense to any liability in tort; and (2) as a procedural matter, the district court abused its discretion in not appointing a guardian ad litem for Sellner in view of his obvious mental incompetence at trial time or, at least, in not conducting a proper inquiry into his competence to defend himself against civil liability.
 
 A.
 
 18
 Because the first set of issues are more easily dealt with, we take them first. In doing so, we review the record without regard to any questions of Sellner's mental incompetence, either as a possible absolute defense on the merits, or as a possible basis for questioning the procedural regularity of the trial.[3]
 
 
 19
 (1)
 
 
 20
 Divorced from the wider question of whether Sellner's now asserted mental incompetence might be a substantive defense against any liability in tort, an issue we consider later, there is obviously no question but that the evidence overwhelmingly supports the finding of actual malice required for an award of punitive damages on the several defamation claims. Sellner's only contention on this point, aside from his wider contention of no tort liability, is that "the record is devoid of evidence that Sellner knew his accusations ... were false," that "on the contrary, ... [he] believed precisely the opposite." This argument is unavailing for two principal reasons.
 
 
 21
 First, it disregards significant evidence that Sellner did actually know that his accusations were false, despite his efforts at trial to prove their truth. Two witnesses, Shiflett and McComas, testified to conversations with Sellner from which the jury could readily infer that Sellner knowingly concocted the accusations out of whole cloth for the purpose of putting pressure on the Prince Georges County police department in his relentless parallel effort to secure "fair treatment" for himself and to revenge himself upon members of that department for his termination.
 
 
 22
 Second, it disregards the fact that malice may be found not only on the basis of knowing falsity, but on the basis of a "reckless disregard for the truth," see, e.g., Embrey v. Holly, 293 Md. 128, 442 A.2d 966, 975 (Md.1982), and that there was abundant evidence from which the jury might have found the requisite "reckless disregard," if not actual knowledge of falsity. See Capital-Gazette Newspapers, Inc. v. Stack, 445 A.2d 1038, 1044 (Md.1982) (reckless disregard may be inferred from fact that statement is "so inherently improbable that only a reckless person would have put it in circulation").
 
 
 23
 (2)
 
 
 24
 The contention that the punitive damages awards totalling $700,000 on all claims, were so excessive that the district court abused its discretion in declining to set them aside, is a more worrisome one, but we think it too must fail.
 
 
 25
 We start with the proposition that in reviewing for excessiveness a jury award that has been upheld by the trial court, the standard of review for federal appellate courts is an exceedingly narrow one, even more deferential than the general abuse of discretion standard. We do not merely ask whether the award is in our view excessive, as does the trial court. Instead, we are required to defer broadly to the combined judgments of jury and trial judge that it is not, and to ask only whether, on an independent review of the evidence, it appears to us not only excessive but so outrageously or monstrously so as to constitute a "denial of justice." Grunenthal v. Long Island Rail Road Co., 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968); West v. Richmond, Fredericksburg & Potomac Railroad Co., 528 F.2d 290, 292-93 (4th Cir.1975).
 
 
 26
 This extremely limited review must of course be conducted in light of the controlling remedial law, here that of Maryland. In Maryland, as generally, factors properly considered in assessing punitive damages are, inter alia, the degree of malice involved, the amount required to deter, and the defendant's ability to pay. See, e.g., Cheek v. J.B.G. Properties, Inc., 344 A.2d 180, 190 (Md.App.1975); Embrey v. Holly, 293 Md. 128, 442 A.2d 966, 973 (1982). Looking to the evidence as it relates to these factors, it certainly cannot be said that the amount is monstrously or outrageously excessive in relation to the degree of malice revealed and presumably found by the jury to have motivated Sellner. Our summary account of the evidence sufficiently shows why.
 
 
 27
 The interrelated "necessity to deter" and "ability to pay" factors present a problem. But it mainly arises from the fact that Sellner steadfastly, indeed obstinately, perhaps contemptuously, refused either in pre-trial discovery or on direct or cross-examination at trial candidly and completely to reveal his financial circumstances or to put any value on assets whose existence was finally, begrudgingly, drawn from him.[4]
 
 
 28
 In consequence of Sellner's recalcitrance, there was less than satisfactory evidence going to his actual ability to pay, hence to assessing an amount sufficient to deter and punish him without destroying him financially. See T.D.S., Inc. v. Shelby Mutual Insurance Co., 760 F.2d 1520, 1530 (11th Cir.1985). While it is fair to say that the value of the assets and income sources finally revealed by Sellner strongly suggest a flat inability to pay the punitive awards (not to say the punitive on top of the compensatory awards), that is about all that can be said. Despite every opportunity to present his true financial situation to the jury and ample warning of the possible consequences of failing to do so, he persisted in obfuscation and concealment to the end.
 
 
 29
 In this circumstance, the appellees contend with some cogency that given Sellner's persistent obfuscation on so vital an issue, the jury was entitled to assume unlimited financial resources. That is of course a draconian principle that we would hesitate to adopt for general application. We need not do that here, in any event, for it suffices to hold here that on the record before it, the district court did not abuse its discretion in declining to set aside as excessive the punitive damage awards on the basis of the lack of evidence of Sellner's ability to pay.
 
 
 30
 Whether a further development of the record on this issue might be considered in the interests of justice is a matter appropriately addressed, if it is to be addressed at all, by the district court. See note 7, infra. On the record as it stands, we cannot find abuse of discretion by the district court in letting the punitive awards stand as against this particular challenge.
 
 
 31
 (3)
 
 
 32
 As indicated, Sellner's contention with respect to the loss of consortium claim is that Maryland has never recognized and would not recognize the existence of such a claim in the absence of physical injury to one of the spouses. When this appeal was briefed and submitted, that issue had not been addressed by the Maryland courts, but in the interval since the appeal's submission the issue has been resolved against Sellner. In Exxon Corporation, USA v. Schoene, 508 A.2d 142 (Md.App.1986), the Maryland Court of Special Appeals has now held that a joint action by spouses for loss of consortium lies for emotional as well as physical injury to the marital relationship.
 
 
 33
 The district court therefore properly submitted the Hudnalls' joint loss of consortium claim for compensatory damages to the jury, whose verdict for the Hudnalls' is not otherwise challenged.
 
 B.
 
 34
 Sellner's most bothersome contentions, advanced for the first time on appeal by appointed counsel,[5] relate to his mental condition.
 
 
 35
 Substantively, it is argued that Sellner's essentially undisputed out-of-court conduct was so manifestly the product of mental incompetence that, as a matter of law, no tort liability should attach to it.
 
 
 36
 Procedurally, it is argued that his mental incompetence to defend himself without guardian or counsel, was so manifest that the district court erred in failing to appoint a guardian ad litem for him or, at least, in failing to conduct a specific inquiry into his competence.
 
 
 37
 We consider these in order.
 
 
 38
 (1)
 
 
 39
 The substantive argument is that, under Maryland law, mental incompetence existing at the time of tortious conduct, whether intentional or negligent, is an absolute defense to tort liability.
 
 
 40
 Laying aside the difficulty that Sellner's mental incompetence has not been legally determined, and surely could not be found as a matter of law on the present record, longstanding Maryland law is, in any event, to the contrary. In Cross v. Kent, 32 Md. 581, 583 (1870), the contention that mental incompetence should absolutely bar tort liability was specifically rejected. While, as Sellner points out, this case is old and its rule has been subject to some criticism in the interval, its continued authority as Maryland law remains, so far as we are advised, unquestioned. Indeed it represents the current majority rule in this country. See Restatement, Second, Torts Sec. 283B (1965).[6]
 
 
 41
 We therefore hold that under Maryland law any mental deficiency suffered by Sellner at the time of the conduct for which the jury imposed tort liability would not relieve him of that liability.
 
 
 42
 (2)
 
 
 43
 The procedural contention is that Sellner's mental incompetence was either so manifest as to compel appointment of a guardian ad litem or at least was so far suggested by the course of proceedings as to make failure to inquire into it an abuse of discretion.
 
 
 44
 While the problem is not without its difficulty, we nevertheless reject the contention. On the record we review, we cannot say that the district court abused its discretion in failing sua sponte to appoint a guardian ad litem or to conduct a collateral inquiry into the matter.
 
 
 45
 First off, there is no question of Sellner's legal capacity to be sued in his own name in this federal diversity action even assuming it could be shown that he was then incompetent. Capacity is controlled by Fed.R.Civ.P. 17(a), which defers questions of legal capacity to the law of Sellner's domicile, here Maryland. Under Maryland law, mental incompetency, even if legally adjudicated, does not affect a party's capacity to be sued in his own name. See Alexander v. Rose, 181 Md. 447, 452 (1943).
 
 
 46
 That leaves only the question whether the district court nevertheless should have appointed a guardian ad litem under Fed.R.Civ.P. 17(c), which provides, in pertinent part, that "[t]he court shall appoint a guardian ad litem for an ... incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the ... incompetent person."
 
 
 47
 This Rule does not indicate the basis upon which a court determines the predicate fact that a party not already legally adjudicated to be so, is presently "incompetent." Obviously if there has been a legal adjudication of incompetence and that is brought to the court's attention, the Rule's provision is brought in play. See Zaro v. Strauss, 167 F.2d 218 (5th Cir.1948). Here, Sellner had not been adjudicated an incompetent. Even had he been, the duty laid by Rule 17(c) upon the court would only have been to appoint a guardian ad litem or to make available or take notice of the existence of other adequate means of protection, that is, to exercise an informed discretion in the matter. Furthermore, any error in failing to appoint would not have been jurisdictional; judgments entered against even legally adjudicated mental incompetents not represented by natural or appointed guardians are not void on the basis alone of their incompetence and lack of representation. Beckley National Bank v. Boone, 115 F.2d 513, 518 (4th Cir.1940).[7]
 
 
 48
 The practical problem presented by a case in which a presumably competent party might be thought to be acting oddly, or foolishly, or self-destructively in prosecuting or defending a civil lawsuit, with or without counsel, is a real one. The problem is whether and at what point any duty devolves upon a court to initiate specific inquiry into whether these surface manifestations suggest that the party may be "incompetent" in fact.
 
 
 49
 Parties to litigation behave in a great variety of ways that might be thought to suggest some degree of mental instability. Certainly the rule contemplates by "incompetence" something other than mere foolishness or improvidence, garden-variety or even egregious mendacity, or even various forms of the more common personality disorders.
 
 
 50
 What the rule undoubtedly contemplates is that form of mental deficiency which--whether or not accompanied by other forms of personality disorder--affects the person's practical ability "to manage his or her own affairs." This is the general test applied by the civil law for making adjudications of "incompetency" for a variety of purposes. It is the test in Maryland. See Md. Est. & Trusts Code Ann. Sec. 13-201(c)(1) ("unable to manage his property and affairs effectively because of ... mental disability ..."). It is the test we have applied to determine whether a party was "incompetent" to defend without representation in civil litigation. See Beckley National Bank, 115 F.2d at 517-19 ("test is the ability to know the nature, character and effect of one's acts, and to understand the subject matter of business transactions"). In common experience, there is of course no necessary relationship between "mental incompetence" in this special sense and various forms of mental derangement or personality disorder that may cause utterly bizarre and destructive conduct in litigation as in other realms.
 
 
 51
 Here, we simply cannot say, looking only to the record before the district court, that Sellner's conduct as there revealed, either in-court or out-of-court, raised, at the time of trial, so serious a question of his "mental competence" as to require a collateral judicial inquiry into its existence. No one formally suggested it. His out-of-court conduct might certainly have been taken to indicate a vindictive, delusional bent of mind. But it also bespoke a shrewd intelligence fully able to manage the practical affairs in which Sellner was zealously engaged. His in-court conduct similarly bespoke an obsessive, utterly unrealistic, or perhaps desperately misplaced reliance upon his ability to defend himself substantively. But it certainly did not bespeak a mind or intelligence so deficient that he did not know "the nature and effect of his acts." Indeed it revealed a rather remarkable mental agility in mastering rudimentary legal skills, an obvious awareness of his context, and a surprising appreciation of the value of certain legal strategies. In short, a common sense appraisal of Sellner on the basis of his out-of-court and in-court conduct would likely have been that here was a person courting destruction out of misplaced zeal or vindictiveness or simple meanness of spirit, who was nevertheless a highly intelligent, shrewd and able person insofar as understanding and managing his immediate practical affairs was concerned. It is impossible to believe, for example, that had Sellner himself resisted an attempt to have him adjudged "incompetent" at the time, he would not easily have succeeded.
 
 
 52
 For this reason, we can find no abuse of discretion on the district court's part in failing sua sponte to conduct a collateral inquiry into Sellner's mental competence, and certainly no error in failing sua sponte to find him incompetent as a matter of law on the basis of his conduct of record. While, in hindsight, it may have been a better exercise of discretion, particularly in view of Sellner's pro se appearance, to have appointed a guardian ad litem out of an abundance of caution, our review asks only whether that was compelled, which we hold it was not.
 
 III
 
 53
 We therefore find no trial court error requiring reversal of the judgments, and they are accordingly affirmed.
 
 
 54
 AFFIRMED.
 
 
 
 [1]
 This summary account of the gist of Sellner's version of events belies its actual internal confusion, variation over time, and the incoherence of its final form as Sellner sought to present and prove its truth at trial. In some intermediate versions, for example, the real Panagoulis had also murdered the real Hudnall, assumed the latter's identity, and collected life insurance proceeds on a policy insuring Martha Ann Hudnall
 Running through the account in all its variant forms however were unmistakable charges of the vilest criminality by both the actual parties Panagoulis and Hudnall. No suggestion has been made, as it could not be, that the very incoherence and shifting nature of the charges made them not legally defamatory.
 
 
 [2]
 Panagoulis' wife was a party to the action when originally commenced. At some point in the proceedings she was dropped as a party plaintiff and only Panagoulis' individual claims were tried to the jury
 
 
 [3]
 The district court applied Maryland substantive law to all the claims. While there may have been questions about the appropriate choice of law with respect to the defamation and loss of consortium claims, none were raised, and the court's exclusive reference to forum state law was appropriate under the circumstances. Ehrenzweig, Conflict of Laws Sec. 128 (1962)
 
 
 [4]
 In a final effort to develop evidence on the matter, the district court ordered Sellner, on two weeks' notice, to produce at trial a financial statement accurately reflecting his net worth. When called upon to produce at the appointed time, Sellner did not do so, explaining that he had been unable for various reasons to obtain a statement. The evidence finally developed was then drawn from him as a hostile witness called by the plaintiffs. It revealed the ownership of several tracts of real estate as Sellner's principal assets. But Sellner's testimony as to value was so evasive that any estimate on the basis of his revelations could only be highly speculative. It is only obvious that the value of those assets finally revealed was far, far short of the total amount of punitive damages awarded. Indeed, if Sellner's revelations of his assets and their probable value is generally accurate, it is obvious that his financial ruin would be assured in payment of the unchallenged amount of the compensatory awards. On that basis, the question of his ability to pay the punitive awards may be largely academic insofar as their practical impact is concerned. While the punitive awards for defamation would almost certainly not be dischargeable in bankruptcy, neither probably would the compensatory awards on the same claims. See 3 Collier on Bankruptcy p 523.16
 
 
 [5]
 Counsel for appellees properly note that none of the errors assigned on appeal was the subject of objection by Sellner below. We consider them only because of the exceptional circumstance of this case, as an exercise of our supervisory jurisdiction in the interest of justice. See Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877-78, 49 L.Ed.2d 826 (1976). None of the assignments of error that we consider is of the sort whose first consideration on appeal put appellees at a disadvantage amounting to positive injustice. Each raises essentially a narrow issue of law whose resolution is not dependent upon facts which appellees have not been able fairly to develop on the record. Cf. Hormel v. Helvering, 312 U.S. 552, 556-57, 61 S.Ct. 719, 721-22, 85 L.Ed. 1037 (1941)
 
 
 [6]
 The Restatement's rationale for this rule, characterized as "an old one, dating back at least to 1616," includes several factors particularly relevant to Sellner's case:
 
 
 [1]
 The difficulty of drawing any satisfactory line between mental deficiency and those variations of temperament, intellect, and emotional balance which cannot, as a practical matter, be taken into account in imposing liability for damage done
 
 
 [2]
 The unsatisfactory character of the evidence of mental deficiency in many cases, ... the difficulties which the triers of fact must encounter in determining its existence, nature, degree, and effect;
 * * *
 
 
 [3]
 The feeling that if mental defectives are to live in the world they should pay for the damage they do, and that it is better that their wealth, if any, should be used to compensate innocent victims than that it should remain in their hands
 
 
 [4]
 The belief that their liability will mean that those who have charge of them ... will be stimulated to look after them, keep them in order, and see that they do not do harm
 Id., comment b.
 
 
 [7]
 Such judgments are only voidable, on a proper showing both that the party was not properly represented and that a meritorious defense exists. Id. at 518; Zaro v. Strauss, 167 F.2d 218, 220 (5th Cir.1948)
 At this stage of these proceedings, such a challenge could only be attempted by motion in the district court under Fed.R.Civ.P. 60(b); see Standard Oil Co. of California v. United States, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976).